UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
TONIA EDWARDS, <u>et</u> <u>al.</u>,                   )
                                          )
        Plaintiffs,                       )
                                          )
        v.                                )        Civil Action No. 10-1557 (PLF)
                                          )
DISTRICT OF COLUMBIA,                     )
                                          )
        Defendant.                        )
_____ )


<u>OPINION</u>

        Since 1932, the District of Columbia has required that those who conduct tours

for profit in the District must obtain a license before doing so.  In July 2010, the District

promulgated regulations defining the tour guide profession and specifying five requirements for

obtaining a tour guide license.  This action presents the question whether the District's tour guide

licensing scheme is in violation of the First Amendment to the United States Constitution.

        Plaintiffs are owners and operators of a tour guide company in the District of

Columbia.  On September 16, 2010, they filed a complaint in this Court, requesting declaratory

and injunctive relief from the District's tour guide licensing scheme and thereafter filed a motion

for a preliminary injunction.  Defendant opposed this motion and simultaneously filed a motion

to dismiss.  The Court heard oral argument on both motions on December 22, 2010, and took

them under advisement.[1]  Upon careful consideration of the parties' papers, the oral arguments

---

[1]        During oral argument, the parties noted the possibility of introducing
documentation into the record, under seal, or filing a set of stipulated facts and then moving for
summary judgment.  <u>See</u> December 22, 2010 Motions Hearing Transcript ("Tr.") at 46-50.  The
Court therefore will deny defendant's motion to dismiss without prejudice and will direct the
parties to file a joint statement regarding how they wish to proceed in this case.

presented by counsel, the relevant legal authorities, and the entire record in this case, the Court will deny plaintiffs' motion for a preliminary injunction and will deny without prejudice defendant's motion to dismiss.[2]

## I. BACKGROUND

### A. Segs in the City

Plaintiffs Tonia Edwards and Bill Main "earn their living as tour guides." Compl. ¶ 4. They own and operate "'Segs in the City,' a Segway-rental and tour business that operates in Washington, D.C., as well as in Annapolis and Baltimore." Mot. for PI at 1.[3] Plaintiffs' business model is the same in all three cities: they "both rent Segways to individuals for private use and provide tours to small groups of people." Id. During the summer months, the busiest time of the year for Segs in the City, "about half of the tours are conducted directly by either [Bill] Main or [Tonia] Edwards — the rest are conducted by independent contractors [p]laintiffs hire for the summer." Id. Most of plaintiffs' part-time guides "are usually college students working on their summer break." Main Decl. ¶ 9. Plaintiffs "usually hire around 15 part-time guides a summer"

---

[2]        The papers reviewed in connection with the pending motions include the following: plaintiffs' complaint ("Compl."); plaintiffs' motion in support of their motion for a preliminary injunction ("Mot. for PI"); the declaration of Tonia Edwards and the declaration of Bill Main in support of plaintiffs' motion for a preliminary injunction ("Edwards Decl.") ("Main Decl."); defendant's motion to dismiss and opposition to plaintiffs' motion for a preliminary injunction ("PI Opp & MTD"); the declaration of Harold P. Pettigrew, Jr. ("Pettigrew Decl."); plaintiffs' combined reply in support of their motion for a preliminary injunction and opposition to defendant's motion to dismiss ("PI Reply & MTD Opp."); and defendant's reply ("MTD Reply"). The Court also has reviewed the transcript of the December 22, 2010 motions hearing.

[3]        Segways are defined as "self-balancing personal transport vehicle[s]." Compl. ¶ 27.

and consider it a "short-term job": plaintiffs "either never or almost never had any of [their part-time guides] return for a second summer." Id.

Plaintiffs describe their tours as follows:

A Segs in the City tour has two basic phases. First, the tour leader spends time training the group (which never has more than 10 people) in how to ride a Segway, including instruction in how to ride safely and how to comply with relevant safety regulations like speed limits. Then, the group puts their newfound knowledge to use, riding the Segways with their guide along one of several established tour routes. Edwards Decl. ¶¶ 14-17; Main Decl. ¶¶ 14-17. Each tour lasts between one and three hours, and Segs in the City operates up to five tours a day, seven days a week. Edwards Decl. ¶¶ 7, 18; Main Decl. ¶¶ 7, 18. As the group members ride, the tour leader communicates with them via a radio earpiece (provided by Segs in the City), occasionally pointing out or describing points of interest along the route. Edwards Decl. ¶¶ 17-19; Main Decl. ¶¶ 17-19.

Mot. for PI at 2.

By statute in effect since 1932, the District of Columbia has required that those who conduct tours for profit in the District must obtain a license before doing so. See D.C. CODE § 47-2836(a). In 2010, the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") promulgated new regulations that specifically define tour guides and that specify five requirements for a tour guide license. See 57 D.C. REG. 6116 (July 16, 2010); D.C. MUN. REGS. TIT. 19, § 1200 et seq. Any individual who violates either the statute or the regulations "shall upon conviction be fined not more than $300 or imprisoned for not more than 90 days." D.C. CODE § 47-2846; see D.C. MUN. REGS. TIT. 19, § 1209.2.[4] The regulations

---

[4]     The statute and regulations are hereinafter referred to together as the "tour guide licensing scheme," unless otherwise noted.

further provide for the possibility of both a fine and imprisonment.  D.C. Mun. Regs. tit. 19, § 1209.2.

Plaintiffs have been leading tours in the District of Columbia for more than six years and continue to do so.  See Segs in the City, http://www.segsinthecity.com/FAQ.htm (last visited Feb. 24, 2011); see PI Opp. & MTD at 15.  Plaintiffs have never obtained a tour guide license, however, and they "refuse to obtain one," because they view the requirement as burdensome and in violation of their First Amendment rights.  Main Decl. ¶ 21; see id. ¶¶ 22-25; Edwards Decl. ¶¶ 22-25.

### B.  Tour Guide Licensing in the District of Columbia

#### 1.  The District of Columbia Code

Since nearly the establishment of the District of Columbia, Congress has delegated to the District the police power to regulate businesses and occupations.  See, e.g., District of Columbia v. John R. Thompson Co., 346 U.S. 100, 113 n.9 (1953).  The current general business licensing scheme derives from an Act passed by Congress in 1902, making "it illegal for any person to engage in or carry on any business, trade, profession, or calling in this District for which a license tax is imposed without first obtaining a license . . . ."  Richards v. Davison, 45 App. D.C. 395, 399, 1916 WL 21670, at *3 (D.C. Cir. 1916).  In that Act, Congress imposed license-registration and fee requirements on various businesses and professions,

> including apothecaries, auctioneers, cattle dealers, proprietors of passenger vehicles for hire, real estate brokers and agents, hotels, restaurants, theaters, and owners or lessees of grounds used for horse racing, tournaments, athletic sports, baseball, football, polo, golf, and kindred games, or where feats of horsemanship are performed.

PI Opp. & MTD at 6 (internal quotations and citation omitted).

4

Thirty years later, in 1932, Congress specifically authorized the regulation of for-profit tour guides in the District of Columbia, providing:

> No person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license to do so. The fee for each such license shall be $10 per annum. No license shall be issued hereunder without the approval of the major and superintendent of police. The Commissioners of the District of Columbia are hereby authorized and empowered to make reasonable regulations for the examination of all applicants for such licenses and for the government and conduct of persons licensed hereunder, including the power to require said persons to wear a badge while engaged in their calling.

ACT OF JULY 1, 1932, 47 STAT. 550, 558 ¶ 38; see PI Opp. & MTD at 6.

In 1994, the Council of the District of Columbia created the Business Regulatory Reform Commission for the purpose of identifying "'statutes and regulations in the District of Columbia that are obsolete, inconsistent or duplicative, especially as they relate to building and land uses, businesses, occupations and professions.'" PI Opp & MTD at 9 (quoting COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER & REGULATORY AFFAIRS, REPORT ON BILL 12-458 at 3, Dec. 19, 1997). Defendant explains that the ultimate result of the Commission's work was a "streamlined . . . business-licensing process" that eliminated "a number of boards and commissions and outdated license categories." Id. at 10 (citing D.C. CODE § 47-2801 et seq.). The tour guide licensing statute, however, remained essentially unchanged from the 1932 statute, and is still in effect to this day, now providing:

> No person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license to do so. The fee for each such license shall be $28 per annum. No license shall be issued hereunder without the approval of the Chief of Police. The Council of the

> District of Columbia is authorized and empowered to make
> reasonable regulations for the examination of all applicants for
> such licenses and for the government and conduct of persons
> licensed hereunder, including the power to require said persons to
> wear a badge while engaged in their calling.

D.C. CODE § 47-2836(a).  Any violation of this statute shall subject an individual, upon

conviction, to a fine of not more than $300 or imprisonment for not more than 90 days.  Id.

§ 47-2846.[5]

## 2.  The District of Columbia Municipal Regulations

The tour guide licensing statute empowers the Council of the District of Columbia

to make "reasonable regulations for the examination of all applicants for such [tour guide]

licenses and for the government and conduct of persons licensed hereunder . . . ."  D.C. CODE

§ 47-2836(a).  Until recently, the regulations promulgated pursuant to this statutory authority had

required, among other things,

> that a guide be a citizen of the United States, be "of sound
> physique, with good eyesight . . . and hearing in both ears; not
> subject to epilepsy, vertigo, or heart trouble; free from any
> contagious or infectious disease; and not a drunkard or addicted to
> the use of habit-forming drugs."

---

[5]    There are only two reported decisions that discuss the District's tour guide
licensing statute.  Neither involved the First Amendment.  In District of Columbia v. Landmark
Servs., Inc., 416 F. Supp. 559 (D.D.C. 1976), the District brought an action against a company
providing tour guide services, seeking to enjoin the company from operating until it complied
with the District's tour guide statute, among others.  Id. at 559-60.  The company "admit[ted] that
ordinarily it would have to comply," id. at 560, but argued that it was exempted by federal law
because it was providing tour guide services from Robert F. Kennedy Memorial Stadium to the
Mall, pursuant to its contract with the Secretary of the Interior.  Id. at 560-61.  Judge Sirica
agreed with the company, holding that it was exempted from compliance with the tour guide
statute.  Id. at 564.  The court of appeals affirmed the district court's judgment with
modifications.  See United States v. District of Columbia, 571 F.2d 651, 653, 660
(D.C. Cir. 1977).

PI Opp. & MTD at 10 (quoting D.C. POLICE REG., ART. II, SEC. 5 (1970); COMMISSIONERS'

ORDER NO. 59-1043 (Jun. 17, 1959)).

In December 2008, however, the DCRA proposed to revise those regulations. See

55 D.C. REG. 12284 (Dec. 5, 2008). The DCRA released a notice of proposed rulemaking that

provided the opportunity for the public at large to comment. See id. After receiving comments,

the DCRA further revised these proposed regulations, see 57 D.C. REG. 4434 (May 21, 2010),

and then revised the proposed regulations a final time before formally promulgating them in their

official, current form on July 16, 2010. See 57 D.C. REG. 6116 (July 16, 2010).

As promulgated, these regulations first specifically define a "tour guide," as

follows:

> Whenever used in this chapter, the term "tour guide" or
> "sightseeing tour guide" shall mean any person [1] who engages in
> the business of guiding or directing people to any place or point of
> interest in the District, or [2] who, in connection with any
> sightseeing trip or tour, describes, explains, or lectures concerning
> any place or point of interest in the District to any person.

D.C. MUN. REGS. TIT. 19, § 1200.1. These regulations then define a "sightseeing tour company"

as "a business that employs a sightseeing tour guide." Id. § 1200.2.

The following section of the regulations, Section 1201, imposes the requirement

that for-profit tour guides obtain a license. It provides:

> No person shall offer to act as a sightseeing tour guide on the
> roads, sidewalks, public spaces, or waterways of the District of
> Columbia unless the person holds a valid sightseeing tour guide
> license issued by the Department of Consumer and Regulatory
> Affairs (Department). . . .

> No business or entity shall offer, for a fee, to conduct walking tours
> or tours where customers operate self-balancing personal transport

vehicles, mopeds, or bicycles unless the business or entity is
licensed by the Department as a sightseeing tour company.

D.C. Mun. Regs. tit. 19, §§ 1201.1, 1201.3.

The regulations also include what the parties refer to as a "holding-out" provision,
which provides that "[n]o person, other than a licensed sightseeing tour company or sightseeing
tour guide may use the words 'sightseeing,' 'tours,' 'guide,' or any combination of these words,
to advertise the availability of sightseeing tour services." D.C. Mun. Regs. tit. 19, § 1201.5.
This latter prohibition does not apply "to the use of these words as part of the identifying
lettering on vehicles coming into the District or to a tour that is not conducted for profit or
compensation." Id.

Under the regulations, in order to obtain the required tour guide license, an
applicant must satisfy five requirements. See D.C. Mun. Regs. tit. 19, § 1203. An applicant
must (1) be at least eighteen years old, id. § 1203.1(a); (2) be proficient in English, id.
§ 1203.1(b); (3) not have been convicted of certain specified felonies, id. § 1203.1(c); (4) make a
sworn statement that all statements contained in his or her application are true and pay all
required licensing fees, id. § 1203.2; and (5) pass an examination "covering the applicant's
knowledge of buildings and points of historical and general interest in the District." Id. § 1203.3.

With respect to the fifth requirement, the examination, the regulations do not
provide any further description or explanation and the Court has not been provided a copy of the
examination for its review. The DCRA has, however, provided a "Study Reference" that
explains that "[t]here are different versions of the examination, each consisting of 100 multiple
choice questions." DISTRICT OF COLUMBIA SIGHTSEEING TOUR GUIDE PROFESSIONAL LICENSING

E<small>XAMINATION</small> S<small>TUDY</small> R<small>EFERENCE</small>, http://www.asisvcs.com/publications/publist.cgi?st=09&ind=

TG&CPCat=TG09STATEREG (last visited Feb. 24, 2011).  Applicants must obtain a minimum

score of 70 to pass.  <u>Id</u>.  According to the DCRA,

> questions may come from any of the following categories:
> Architectural; Dates; Government; Historical Events; Landmark
> Buildings; Locations; Monuments, Memorials; Museums and Art
> Galleries; Parks, Gardens and Zoo Aquariums; Presidents;
> Sculptures and Statutes; Universities; Pictures; Regulations.

<u>Id</u>.  The examination fee is $200.00.  <u>Id</u>.

Similar to the penalty provision in D.C. Code Section 47-2846, any individual

who violates any provision of the tour guide regulations "shall, upon conviction, be fined not

more than three hundred dollars ($300) or imprisoned for not more than ninety (90) days, or

both."  D.C. M<small>UN</small>. R<small>EGS</small>. <small>TIT</small>. 19, § 1209.2.[6]

---

[6]        At least four other cities have promulgated similar tour guide licensing
regulations: Philadelphia, Pennsylvania; New York, New York; Savannah, Georgia; and
Charleston, South Carolina.  <u>See</u> P<small>HILADELPHIA</small> C<small>ODE</small> § 9-214 <u>et seq</u>.; N<small>EW</small> Y<small>ORK</small> C<small>ITY</small>
A<small>DMINISTRATIVE</small> C<small>ODE</small> § 20-242 <u>et seq</u>.; C<small>ITY OF</small> S<small>AVANNAH</small>, G<small>EORGIA</small>, O<small>RD</small>. 2-9-78, S<small>EC</small>. 1,
§ 6-1501 <u>et seq</u>.; C<small>ITY OF</small> C<small>HARLESTON</small>, S<small>OUTH</small> C<small>AROLINA</small>, O<small>RD</small>. N<small>O</small>. 1998-174, A<small>RTICLE</small> III,
§ 29-58.  The National Park Service has a similar regulation, promulgated in 1959, that requires
the licensing of tour guides in National Military Parks.  <u>See</u> 36 C.F.R. § 25.2.

        As far as the Court is aware, Philadelphia's tour guide regulations are the only
other regulations to have been challenged on First Amendment grounds.  <u>See</u> <u>Tait v. City of
Philadelphia</u>, 639 F. Supp. 2d 582 (E.D. Pa. 2009).  The district court in <u>Tait</u>, however, did not
reach the merits of the First Amendment claim.  <u>See id</u>. at 585.  Instead, because the city
indicated that it would not be able to enforce the regulations due to economic decline and scarcity
of resources, the district court held that the city's inability to enforce the regulations "vitiates
ripeness" and dismissed the case for lack of subject matter jurisdiction.  <u>Id</u>.  The Third Circuit
affirmed this decision, without comment on the merits of the First Amendment claim.  <u>See</u> <u>Tait
v. City of Philadelphia</u>, No. 09-3599, 2011 WL 359700, at *1, *4 (3d Cir. Feb. 7, 2011).

## II.  LEGAL STANDARD

A preliminary injunction is "'an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'" Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)).  To warrant preliminary injunctive relief, a moving party must show: (1) that there is a substantial likelihood that it will succeed on the merits of its claims; (2) that it will suffer irreparable harm in the absence of an injunction; (3) that an injunction would not substantially harm the defendant or other interested parties (balance of harms); and (4) that the public interest would be furthered, or at least not adversely affected, by the injunction.  See id.; Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

These four factors must be viewed as a continuum, with more of one factor compensating for less of another.  Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1291-92. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995).  An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury."  Id.  Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits.  The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors.  Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-45 (D.C. Cir. 1977).  An injunction may be

issued "with either a high probability of success and some injury, or *vice versa*." Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985) (emphasis in original).

Despite this flexibility, however, "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue," and "[a] . . . failure to show *any* irreparable harm" constitutes grounds for denying the motion for a preliminary injunction, "even if the other three factors entering the calculus merit such relief." Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297 (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d at 747, and citing Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989)) (emphasis added).

## III.  DISCUSSION

Plaintiffs assert both a facial and an as-applied First Amendment challenge to D.C. Code Section 47-2836 and to the regulations recently promulgated under it.  See Compl. at 10.  Although plaintiffs contend that each preliminary injunction factor weighs strongly in their favor, Mot. for PI at 6, their motion is essentially dependent on a favorable finding on the first factor — the likelihood of success on the merits of their First Amendment claim.  Plaintiffs contend that they are substantially likely to succeed on the merits because the District's tour guide licensing scheme is a content based prior restraint on speech that cannot survive strict scrutiny review.  Id. at 7.  Plaintiffs also maintain that they will suffer irreparable harm in the absence of an injunction because of their asserted clear constitutional injury.  Id. at 13-14.

Defendant responds that the tour guide licensing scheme implicates only commercial speech, subject to a less searching standard of review than pure speech.  Opp. &

MTD at 16.  In the alternative, defendant contends that even if the Court were to reject its

commercial speech argument, the licensing scheme is content neutral and survives intermediate

scrutiny review.  Id. at 20, 23.[7]

## A.  The Merits

### 1.  More Than Commercial Speech

Defendant argues that because the licensing scheme is triggered only when tour

guides are "*for hire*, . . . . the challenged restrictions apply only to commercial speech, which is

accorded lesser protection under the First Amendment than other speech."  PI Opp. & MTD at 5

---

[7]     Defendant's papers suggested that plaintiffs may lack standing.  See Opp. & MTD at 40.  During oral argument, however, defendant's counsel conceded that defendant does not challenge plaintiffs' standing in this case.  Tr. at 34:16-21.

The parties' papers also raise two possible threshold questions.  First, defendant contends that plaintiffs' challenge can only be a facial one, given that plaintiffs have "never applied for a license, and there's no credible threat of prosecution."  Tr. at 31:21-22; see also PI Opp. & MTD at 15.  Accordingly, defendant contends that plaintiffs must satisfy a high burden to prevail in this case.  PI Opp. & MTD at 15.  Plaintiffs did not respond to this argument in their papers.  During oral argument, plaintiffs' counsel stated that plaintiffs did in fact plead both types of challenges in their complaint but conceded that plaintiffs have not applied for a license.  See Tr. at 18:2-19:13.  Plaintiffs' counsel then asserted that Citizens United v. Federal Election Commission, 130 S. Ct. 876, 893 (2010), now makes clear that the difference between facial and as-applied challenges "is fundamentally a question of remedy . . . ."  Tr. at 18:7.

Second, the parties' papers raise the question whether the District's tour guide licensing requirements could be considered general occupational licensing requirements subject only to rational basis review and outside of First Amendment scrutiny.  See Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 239 (1957); Taucher v. Born, 53 F. Supp. 2d 464, 476 (D.D.C. 1999).

The Court need not resolve either question.  Regardless of how plaintiffs characterize the nature of their challenge and assuming that the First Amendment does in fact apply, the Court concludes that the tour guide licensing scheme is content neutral and survives intermediate scrutiny review.

(internal quotations and citation omitted) (emphasis in original). Plaintiffs disagree with defendant's "sweeping proposition that 'commercial speech' means 'speech someone wouldn't engage in for free.'" PI Reply & MTD Opp at 7. Plaintiffs argue that the type of speech at issue in this case is well outside of the commercial speech category. Id. at 6-7.

The Court agrees with plaintiffs. As this Court has recognized: "'[T]he degree of First Amendment protection is not diminished merely because . . . speech is sold rather than given away.'" Enten v. District of Columbia, 675 F. Supp. 2d 42, 50 (D.D.C. 2009) (quoting City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 756 n.5 (1988)). "[E]xpressive materials do not lose their First Amendment protection merely because they are offered for sale. . . . Indeed, the [Supreme] Court long ago reminded us 'that the pamphlets of Thomas Paine were not distributed free of charge.'" ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 953-54 (D.C. Cir. 1995) (quoting Murdock v. Pennsylvania, 319 U.S. 105, 111 (1943)).

Defendant fails to appreciate the distinction between speech-for-profit and commercial speech. Commercial speech is "speech which does no more than propose a commercial transaction," Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983) (internal quotations and citation omitted), but speech "carried in a form that is sold for profit," Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761 (1976) (internal quotations and citation omitted), is not commercial speech. As an example, "[a]n astrological prediction, without more, is not commercial speech because the speech is the substance of the transaction. Commercial speech — like an advertisement — is incidental to an economic transaction; it proposes or encourages a transaction." Rushman v. City of Milwaukee,

959 F. Supp. 1040, 1043 (E.D. Wis. 1997).  Thus, to qualify as commercial speech subject to

lesser protection under the First Amendment, the speech

> must . . . be a means to another end, not an end in itself.  In other
> words, commercial speech, statements encouraging a future
> economic transaction, is different than speech-for-profit, the sale of
> ideas and words. . . . Tutoring, providing legal advice, or giving
> medical advice is speech-for-profit, not commercial speech. . . .
> Telling fortunes or giving advice based on astrology (without
> more) is speech-for-profit, not commercial speech.

Id. (internal citations omitted); see also Trimble v. City of New Iberia, 73 F. Supp. 2d 659, 666

(W.D. La. 1999) ("Just because someone may pay a fee for the plaintiffs' services, the telling of

fortunes and the giving of spiritual advice does not propose a commercial transaction.").

Indeed, the Eighth Circuit, in the context of a First Amendment challenge to a law

prohibiting for-profit fortune-telling, rejected the very same argument that defendant makes here:

> The speech itself, fortunetelling, is not commercial simply because
> someone pays for it.  The speech covered by the ordinance, for the
> most part, does not simply propose a commercial transaction.
> Rather, it *is* the transaction.  The speech itself is what the client is
> paying for. . . . There is a distinct difference between the offer to
> tell a fortune ("I'll tell your fortune for twenty dollars."), which is
> commercial speech, and the actual telling of the fortune ("I see
> your future . . . ."), which is not.

Argello v. City of Lincoln, 143 F.3d 1152, 1153 (8th Cir. 1998) (emphasis in original) (internal

quotations and citation omitted).  The Court therefore rejects defendant's contention that only

commercial speech is implicated in this case.[8]

---

[8]     Plaintiffs do concede that one — but only one — regulation is directed purely at
commercial speech: the holding-out provision.  See Mot. for PI at 12-13.  As discussed, Section
1201.5 of the regulations prohibits anyone other than a licensed sightseeing company or tour
guide from advertising its services using the words "'sightseeing,' 'tours,' 'guide,' or any
combination of these words, to advertise the availability of sightseeing tour services."  D.C.
MUN. REGS. TIT. 19, § 1201.5.  Plaintiffs' argument here is that this commercial speech

2.  Content Neutral

The next question, then, is whether the tour guide licensing scheme is content neutral or content based.  This determination "is critical, not because it might end the inquiry, but because it will direct its path."  Boardley v. U.S. Dep't of the Interior, 615 F.3d 508, 516 (D.C. Cir. 2010).  "'Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.'"  Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 135 (1992) (quoting Regan v. Time, Inc., 468 U.S. 641, 648-49 (1984)).  Not surprisingly, therefore, defendant argues that the licensing scheme is content neutral, while plaintiffs contend that it is content based.  The Court agrees with defendant that it is content neutral and therefore is subject to intermediate — not strict — scrutiny.  As this Court has explained:

> "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" Id. (internal citations omitted).

A.N.S.W.E.R. Coal. v. Kempthorne, 537 F. Supp. 2d 183, 195 (D.D.C. 2008).

---

restriction cannot stand separately from the underlying licensing requirements and that these terms are truthful and nonmisleading.  Mot. for PI at 13.  Given the Court's conclusion that the underlying licensing requirements are valid, plaintiffs' argument on this point becomes moot. Cf. Nat'l Ass'n for the Advancement of Psychoanalysis v. California Bd. of Psychology, 228 F.3d 1043, 1056 n.10 (9th Cir. 2000) ("Plaintiffs concede that, if the licensing scheme is otherwise valid, they have no viable commercial speech claim for the right to use professional titles, such as 'psychoanalyst' and 'analytical psychologist.'").

*a. The District of Columbia Statute*

The parties' papers generally treat the District's statute and the regulations promulgated under it as one and the same.  <u>See</u>, <u>e.g.</u>, Compl. at 10.  During oral argument, however, plaintiffs' counsel came close to conceding that, with respect to the statute, there is no basis, independent from the regulations, for concluding that it is content based.  <u>See</u> Tr. at 16:12-17:19.  This concession would be appropriate because D.C. Code Section 47-2836 is "indisputably content-neutral on [its] face." <u>Boardley v. U.S. Dep't of the Interior</u>, 615 F.3d at 516.

This statute, in effect and unchallenged since 1932, makes no reference to speech at all; its focus is only on conduct, providing that "[n]o person shall, for hire, *guide or escort* any person through or about the District of Columbia . . . unless he shall have first secured a license to do so."  D.C. CODE § 47-2836(a) (emphasis added).  Clearly, this statute requires a license regardless of any message a tour guide may wish to convey.  <u>See</u> <u>Boardley v. U.S. Dep't of the Interior</u>, 615 F.3d at 516; <u>A.N.S.W.E.R. Coal. v. Kempthorne</u>, 537 F. Supp. 2d at 195. And plaintiffs have provided no basis for the Court to conclude that Congress and then the Council of the District of Columbia were "motivated to adopt [this statute] by [their] agreement with or hostility toward any particular message or speaker." <u>Boardley  v. U.S. Dep't of the Interior</u>, 615 F.3d at 516.

*b. The District of Columbia Municipal Regulations*

Plaintiffs' "primary First Amendment argument is in the regulations."  Tr. at 16:23-24.  It begins with the proposition that plaintiffs "tell stories for a living."  Mot. for PI

at 5. Plaintiffs then assert that "[w]hat [they] do for a living is no different from what stand-up comedians do, is no different from what broadcast journalists do, is no different from what college professors do." Tr. at 27:12-15. Plaintiffs continue: the recently promulgated regulations are expressly directed at speech — and only speech — because they "apply only to people who 'describe[], explain[], or lecture[] concerning any place or point of interest in the District to any person' on a tour . . . ." Mot. for PI at 8 (quoting D.C. MUN. REGS. TIT. 19, § 1200.1); see also PI Reply & MTD at 3-4. By contrast, plaintiffs contend, "[p]eople who choose to talk about other things may do so freely." Mot. for PI at 8. Thus, plaintiffs conclude that the District's tour guide "licensing regulations are content based because they impose burdens (in the form of fees and a mandatory examination) on people whose speech contains particular content: information about points of interest in Washington, D.C." Id.

The Court disagrees. First, plaintiffs do more than speak for a living and their comparison with stand-up comedians, broadcast journalists, and college professors is inapt. As plaintiffs state in their complaint, their profession has two components: plaintiffs (1) "direct" tour groups around the District and (2) "describe" sights and buildings. Compl. ¶ 31. Indeed, as plaintiffs further specify, their tours have "two basic phases": first, after providing some training on how to ride a Segway, "the group . . . rid[es] the Segways with their guide along one of several established tour routes"; second, "[a]s the group members ride, the tour leader communicates with them via a radio earpiece . . . , occasionally pointing out or describing points of interest along the route." Mot. for PI at 2 (emphasis added) (internal quotations and citations omitted). Thus, plaintiffs' profession involves conduct and, by their terms, only occasional speech. Id.; see Edwards Decl. ¶ 17; Main Decl. ¶ 17.

17

The Court concludes that the plain reading of the municipal regulations shows that they are directed at plaintiffs' conduct — not their speech. The regulations unambiguously define a tour guide to mean any person

> [1] who engages in the business of *guiding or directing* people to any place or point of interest in the District, *or*

> [2] who, *in connection with any sightseeing trip or tour*, describes, explains, or lectures concerning any place or point of interest in the District to any person.

D.C. MUN. REGS. TIT. 19, § 1200.1 (emphasis added). The plain language of the regulations thus makes clear that speech is not the trigger for the licensing requirement. Rather, like the statute, the regulations are triggered by conduct: the *guiding or directing* of a sightseeing trip or tour. Any individual who guides or directs people around the District for profit — regardless of whether that individual, like plaintiffs, "*occasionally* point[s] out or describ[es] points of interest along the route," Edwards Decl. ¶ 17 (emphasis added) — must first acquire a license. Therefore, like the statute, these regulations require a license regardless of any message a tour guide may wish to convey. See Boardley v. U.S. Dep't of the Interior, 615 F.3d at 516; A.N.S.W.E.R. Coal. v. Kempthorne, 537 F. Supp. 2d at 195. These regulations are "'unrelated to the content of expression'" and have, at most, "'an incidental effect on some speakers or messages but not others.'" Mahoney v. District of Columbia, 662 F. Supp. 2d 74, 87 (D.D.C. 2009) (quoting Ward v. Rock Against Racism, 491 U.S. at 791-92).

Plaintiffs argue in reply that "[t]he best way to see that the guide-licensing scheme takes aim at pure speech" is to examine (1) how the regulations treat vehicles that utilize only audio recordings rather than a person who talks or conveys information, PI Reply & MTD Opp.

at 4-5, and (2) the requirement that licensees pass "a history test." Tr. at 5:12-14. Turning first

to the distinction between the types of vehicles that may be utilized by a sightseeing tour

company, plaintiffs refer to Section 1204.3 of the municipal regulations, which

provides:

> A vehicle operated by a licensed sightseeing tour company shall
> have at least one (1) licensed sightseeing tour guide on board the
> vehicle during its sightseeing tours in the District. *This
> requirement shall not apply to a vehicle that utilizes only audio
> recordings during the sightseeing tour*; provided, that a driver of
> such a sightseeing tour vehicle who talks, lectures, or otherwise
> provides sightseeing information to passengers while the vehicle is
> in motion must be licensed as a sightseeing guide.

D.C. MUN. REGS. TIT. 19, § 1204.3 (emphasis added). According to plaintiffs, this regulation

means that "[d]rivers of tour buses, buses that drive around town while information plays on a

prerecorded loop, while they're certainly escorting people around town, do not need a

[tour guide] license," whereas drivers who "talk, lecture, or otherwise provide sightseeing

information to passengers" do need a license. Tr. at 4:5-11. Plaintiffs thus contend that this one

section of the regulations is "very strong evidence of . . . the most natural reading of" this

regulatory scheme, which is that it only covers and is directed at "people who are conveying

sightseeing information to people on tours." Id. at 12:15-18. The Court disagrees.

The section of the regulations on which plaintiffs rely must be read both according

to its plain language and in the context of the entire regulatory scheme. It is a portion of Section

1204 of the regulations, entitled "Requirements for Sightseeing Tour Companies." It thus applies

to sightseeing tour companies which must, under the regulations, first have obtained a license to

operate as a sightseeing tour company, see D.C. MUN. REGS. TIT. 19, §§ 1201, 1202, as well as to

any tour guides it employs, who also must obtain their own separate licenses.  See id. §§ 1201, 1203.  The portion of Section 1204 on which plaintiffs rely requires that a vehicle operated by a "licensed sightseeing tour company" must have a licensed sightseeing tour guide on board its vehicle while conducting a sightseeing tour in the District of Columbia.  Id. § 1204.3.  But it provides a narrow exception to this requirement: If a licensed sightseeing tour company chooses to operate a vehicle that utilizes only audio recordings during a sightseeing tour, it is not required to have a licensed sightseeing tour guide on board.  Id.  In such case, the sightseeing tour company is permitted to hire a driver only — who may insert an audio recording into a recorder as he begins the drive — rather than hiring both a driver and a separate tour guide.  This exception recognizes that the business of driving a bus is different from the business of guiding or directing tours.  But if a bus driver wears two hats — both driving the tour vehicle and also "provid[ing] sightseeing information to passengers" while driving —  the regulations require that he or she must be licensed as a sightseeing tour guide.  Id.  Why?  Because then the driver is engaging in the conduct of "guiding or directing people" to places of interest in the District, id. § 1200.1, and, in connection with the activities of "guiding or directing," id., the driver is explaining points of interest along the way.  Id. § 1204.3.  In other words, he or she then is both a bus driver and a tour guide, and — like everyone else who engages in the conduct of guiding or directing — the regulations require that such person be licensed.

The section of the regulations on which plaintiffs rely does not turn on whether one person speaks and the other does not but, rather, on the distinction between those who are engaged in the conduct of "guiding or directing" people to places of interest and those who engage in the very different conduct of driving a bus.  By focusing on the one narrow exception

in the regulations with respect to one type of vehicle that might be used by a licensed sightseeing tour company, plaintiffs totally ignore the "guiding or directing" component of the definition of a tour guide, which is the central focus of the regulations at issue in this case. See Gonzalez-Vera v. Townley, 597 F. Supp. 2d 98, 101 (D.D.C. 2009) ("'[C]ourts must give effect, if possible, to every clause and word'" of a regulation.) (quoting Williams v. Taylor, 592 U.S. 362, 364 (2000)).[9]

The Court also disagrees with plaintiffs' argument that the examination requirement somehow shows that "the licensing requirements are all geared toward confirming a tour guide's ability to communicate adequately," PI Reply & MTD Opp. at 4, and thus are aimed at speech. Although the Court has not reviewed an actual copy of the examination, according to the DCRA,

> questions may come from any of the following categories: Architectural; Dates; Government; Historical Events; Landmark Buildings; Locations; Monuments, Memorials; Museums and Art Galleries; Parks, Gardens and Zoo Aquariums; Presidents; Sculptures and Statutes; Universities; Pictures; Regulations.

DISTRICT OF COLUMBIA SIGHTSEEING TOUR GUIDE PROFESSIONAL LICENSING EXAMINATION STUDY REFERENCE, http://www.asisvcs.com/publications/publist.cgi?st=09&ind= TG&CPCat= TG09STATEREG (last visited Feb. 24, 2011). The Court agrees with defendant that the purpose

---

[9] Even apart from the distinction explained above, the Court suspects that this exception may also have been included in the tour guide licensing scheme because drivers of such sightseeing vehicles are already regulated under another Title of the municipal regulations, which was neither discussed nor cited by the parties. Section 1000 of Title 31 of the municipal regulations provides that "[n]o person shall operate or permit to be operated any vehicle for sightseeing purposes unless a certificate permitting that use is issued by the Chairperson of the District of Columbia Taxicab Commission." D.C. MUN. REGS. TIT. 31, § 1000.3. Those who wish to obtain a "license to operate a[] . . . sightseeing vehicle" — the bus drivers — already must meet minimum standards of good moral character and health requirements, id. § 1008.1, and must take a test concerning "knowledge of the Metropolitan Area." Id. § 1008.4.

of this examination is to ensure some minimal competence and knowledge for those who

"guid[e] or direct[] people" around the District of Columbia — whether they choose to speak or

not.  The Court therefore finds that the tour guide licensing regulations are content neutral.

### 3.  Intermediate Scrutiny

Content based regulations of speech are constitutional only if they withstand strict

scrutiny.  United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813 (2000).

Content neutral regulations, by contrast, are subject only to an intermediate scrutiny analysis.

Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d 4, 12 (D.C. Cir.

2008) (citing United States v. O'Brien, 391 U.S. 367, 377, 388 (1968)).  Because the Court

concludes that both the statute and the regulations at issue in this case are content neutral, they

must be examined "under a familiar multipart test: First, the regulation may not delegate overly

broad licensing discretion to a government official.  Second, the scheme must be narrowly

tailored to serve a significant governmental interest.  And third, it must leave open ample

alternatives for communication."  Boardley v. U.S. Dep't of the Interior, 615 F.3d at 516; see

also Enten v. District of Columbia, 675 F. Supp. 2d at 51 (content neutral licensing requirements

must be "narrowly tailored" to serve a significant governmental interest; must "leave open ample

alternative channels of communication"; and must "not unduly delegate authority to a

government official").

First, the Court concludes that the tour guide licensing scheme does not delegate

overly broad licensing discretion to the DCRA.  As discussed, the regulations require that an

applicant be at least eighteen years old, be proficient in English, have not been convicted of

certain specified felonies, and pass an examination that, according to the DCRA, requires an

applicant to answer correctly 70 out of 100 questions on multiple topics concerning the District.

See D.C. MUN. REGS. TIT. 19, § 19-1203.  These specifications are "sufficiently 'narrow,

objective, and definite' that they do not constitute an undue delegation of authority to the DCRA

or give it the kind of discretion that could become a 'means of suppressing a particular

viewpoint.'"  Enten v. District of Columbia, 675 F. Supp. 2d at 54 (quoting A.N.S.W.E.R. Coal.

v. Kempthorne, 537 F. Supp. 2d at 197).

      Second, the licensing scheme is narrowly tailored to serve a significant

government interest.  According to defendant, this scheme

> helps ensure that professional tour guides will be reliable and
> reputable, and enables the District to monitor the business and
> practice of tour guides . . . to guarantee compliance with District
> law and continued protection of consumers from "ignorance,
> incapacity or imposition."

PI Opp. & MTD at 30.  As defendant notes, a recent study shows that the District is the

third-most popular tourist destination in America, which attracts approximately fifteen million

visitors each year.  Id. at 31.  It is estimated, according to the defendant, that travel and tourism

supports more than 66,000 full-time jobs in the District, generating some $2.6 billion in wages.

Id.  Thus, visitors and District residents alike "are entitled . . . to have minimal competence

standards for tour guides . . . , who can be held responsible for their business practices."  Id.

at 35.  Clearly, the promotion of a major industry and the protection of the general welfare of

society are significant government interests.  See Smith v. City of Fort Lauderdale, Fl., 177 F.3d

954, 956 (11th Cir. 1999) (upholding content neutral city regulations proscribing soliciting,

begging, or panhandling in a specified area because the regulations were narrowly tailored to

provide "a safe, pleasant environment" and to prevent an adverse impact on tourism); One World One Family Now v. City of Miami Beach, 175 F.3d 1282, 1288 (11th Cir. 1999) ("There is . . . no question that the city's . . . interest in creating an aesthetic ambiance which will attract tourists . . . is a substantial government interest . . . ."); see also United States v. Mahoney, 247 F.3d 279, 286 (D.C. Cir. 2001) (stating that the government has a significant interest in "'ensuring public safety and order'") (quoting Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 376 (1997)); cf. People v. Bowen, 175 N.Y.S.2d 125, 128 (N.Y. Ct. Spec. Sess. 1958) (Tour guides have "the responsibility of seeing that the strangers in our midst are properly cared for and guided. Guides must be persons of knowledge and integrity — not steerers for fly-by-night operators. It is a matter of public concern and interest that they be carefully supervised.").

With respect to whether the licensing scheme is narrowly tailored, defendant maintains that the regulations "are narrowly drawn, because they do not prohibit all commercial sightseeing activity, but merely prevent unlicensed tour guides from conducting paid tours." PI Opp. at MTD at 25. Plaintiffs disagree, arguing that there are many other less-restrictive options: for example, the District of Columbia could provide city-operated educational forums or hire its own tour guides; or the District could adopt a voluntary certification program. Mot. for PI at 11-12. It is established, however, that the District is not required to adopt the least restrictive means of pursuing its interests. See American Library Ass'n v. Reno, 33 F.3d 78, 88 (D.C. Cir. 1994) ("[A] narrowly tailored regulation need not be the least restrictive or least intrusive means of serving the government's content-neutral interests.") (internal quotations and citation omitted). A content neutral statute or regulation will meet the narrow-tailoring requirement "if a

substantial portion of the burden it imposes furthers the Government's interest, even though a less intrusive alternative might also exist." Id.

Under the regulations, individuals who wants to act as for-profit tour guides, among other things, cannot have committed certain specified felonies and must pass an examination concerning general knowledge about the District. The Court concludes that these basic requirements are narrowly tailored to substantially further (1) the purpose of providing for the general welfare of society by attempting to ensure that those with serious felonies on their records are not guiding or directing tourists and residents around the District, and (2) the purpose of promoting the tourism industry by attempting to ensure that those who guide or direct people around the District have, at least, some minimal knowledge about what and where they are guiding or directing people to.

Finally, the licensing scheme leaves open ample alternatives for communication. Prior to obtaining a license, plaintiffs "still may engage in expressive activity by doing everything [they do] now except for" conducting their tours for profit. Enten v. District of Columbia, 675 F. Supp. 2d at 53. The Court therefore concludes that "the means of communication available to [plaintiffs] are adequate." Id.

Both the statute and the regulations survive intermediate scrutiny review. Therefore, plaintiffs fail to meet their burden of establishing that they have a substantial likelihood of success on the merits of their First Amendment claim.

*B. Irreparable Harm*

Plaintiffs' irreparable harm argument rests entirely on their First Amendment claim. Because the Court concludes that plaintiffs have not shown that the tour guide licensing scheme violates their rights under the First Amendment, it also concludes that plaintiffs are "not faced with irreparable harm absent the issuance of an injunction." Enten v. District of Columbia, 675 F. Supp. 2d at 54. "Although having one's protected speech chilled can constitute an irreparable injury," plaintiffs have not shown that their right to freedom of speech has been restricted. Id. (citing Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 301) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, may constitute irreparable injury . . . .") (internal quotations and citation omitted).[10]

## IV. CONCLUSION

The Court concludes that plaintiffs have not demonstrated that they are likely to prevail on the merits of their claim that the District of Columbia tour guide licensing scheme is an unconstitutional restriction on plaintiffs' First Amendment rights. Furthermore, the Court concludes that plaintiffs are not faced with irreparable harm in the absence of an injunction. Absent a showing of a likelihood of success on the merits and irreparable injury, the two remaining prongs, balance of harms and the public interest, need not be addressed. See Enten v. District of Columbia, 675 F. Supp. 2d at 54.

---

[10]    Plaintiffs assert that this tour guide licensing scheme would limit their ability to hire part-time guides, and, "without these part-time guides, [plaintiffs are] not sure [they] could keep the business going — at least not in its current form." Main Decl. ¶ 24. To the extent that this is an irreparable harm argument, this assertion suggests nothing more than general economic harm. Such an argument fails under the rule that "'economic harm does not constitute irreparable injury.'" Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC, Civil Action No. 10-2332, 2011 WL 263674, at *6 (D.D.C. Jan. 28, 2011) (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1295 (D.C. Cir. 2009)).

For the foregoing reasons, plaintiffs' motion for a preliminary injunction

[Dkt. No. 7] will be DENIED and defendant's motion to dismiss [Dkt. No. 9] will be DENIED

without prejudice.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/
_____
PAUL L. FRIEDMAN
DATE:  February 25, 2011                          United States District Judge