UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
TONIA EDWARDS, et al.,                  )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )          Civil Action No. 10-1557 (PLF)
                                        )
THE DISTRICT OF COLUMBIA,               )
                                        )
                Defendant.              )
_____ )

OPINION

        The issue in this case is whether the District of Columbia's tour guide licensing

scheme violates the First Amendment to the United States Constitution.  Plaintiffs are owners

and operators of a sightseeing tour company in the District of Columbia called Segs in the City.

The Court previously denied plaintiffs' motion for a preliminary injunction and defendant's

motion to dismiss.  See Edwards v. Dist. of Columbia, 765 F. Supp. 2d 3 (D.D.C. 2011).  This

matter is now before the Court on the parties' cross-motions for summary judgment.  Upon

careful consideration of the parties' papers, relevant legal authorities, and the entire record in this

case, the Court granted defendant's motion for summary judgment and denied plaintiffs' motion

by Order of March 28, 2013.[1]  This Opinion explains the reasoning behind that Order.

_____

[1]        The papers reviewed in connection with these motions include the following:
plaintiffs' complaint ("Compl.") [Dkt. No. 1]; plaintiffs' motion for preliminary injunction [Dkt.
No. 7]; defendant's consolidated motion to dismiss and opposition to plaintiffs' motion for
preliminary injunction ("Def.'s MTD") [Dkt. No. 9]; defendant's motion for summary judgment
("Def.'s MSJ") [Dkt. No. 36]; plaintiffs' motion for summary judgment ("Pls.' MSJ") [Dkt. No.
37]; the declarations of Robert McNamara, Tonia Edwards, and Bill Main ("McNamara Decl.")
[Dkt. No. 37-2], ("Edwards Decl.") [Dkt. No. 37-6], ("Main Decl.") [Dkt. No. 37-7];
defendant's opposition to plaintiffs' summary judgment motion ("Def.'s Opp.") [Dkt. No. 39];

## I.  BACKGROUND

### A. Regulating Washington's Tourism Industry

The District of Columbia's business licensing framework derives from a 1902 Act of Congress that made it "illegal for any person to engage in or carry on any business, trade, profession, or calling in this District for which a license tax is imposed without first obtaining a license."  Richards v. Davison, 45 App. D.C. 395, 399 (D.C. 1916) (describing Act of July 1, 1902, 32 Stat. 622, 623 § 7, ¶ 1).  Congress enacted a statute in 1932 that provided that "[n]o person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license to do so."  Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 8 (describing Act of July 1, 1932, 47 Stat. 550, 558 ¶ 38).  The 1932 Act also authorized the Commissioners of the District of Columbia to create reasonable regulations governing the examination of and standards for tour guides.  Id.  The District has since revised and eliminated portions of its early regulatory laws, see id., but the tour guide licensing statute has remained essentially unchanged, now providing:

> No person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license so to do.  The fee for each such license shall be $28 per annum.  No license shall be issued hereunder without the approval of the Chief of Police.  The Council of the District of Columbia is authorized and empowered to make reasonable regulations for the examination of all applicants for such licenses and for the government and conduct of persons licensed hereunder, including the power to require said persons to wear a badge while engaged in their calling.

---

plaintiffs' opposition to defendant's summary judgment motion ("Pls.' Opp.") [Dkt. No. 41]; defendant's reply in support of its summary judgment motion ("Def.'s Reply") [Dkt. No. 43]; and plaintiffs' reply in support of their summary judgment motion ("Pls.' Reply") [Dkt. No. 44].

D.C. CODE § 47-2836(a) (2012).  A violation of this statute currently subjects a person, upon

conviction, to a fine of not more than $300 or imprisonment for not more than 90 days.

Id. § 47-2846.[2]  No court has decided a First Amendment challenge to the District's tour guide

licensing statute or regulations prior to this action.  See Edwards v. Dist. of Columbia, 765 F.

Supp. 2d at 9 n.5.

    At the heart of this dispute are the municipal regulations accompanying the

District's tour guide licensing statute.  From 2008 to 2010, the D.C. Department of Consumer

and Regulatory Affairs proceeded through notice and comment procedures to consider revising

the District's municipal regulations on tour guide licensing.  It published the new regulations in

their current form on July 16, 2010.  See 55 D.C. REG. 12284 (Dec. 5, 2008); 57 D.C. REG. 4434

(May 21, 2010); 57 D.C. REG. 6116 (July 16, 2010).  The revised regulations first define a "tour

guide" as:

> [a]ny person [1] who engages in the business of guiding or
> directing people to any place or point of interest in the District, or
> [2] who, in connection with any sightseeing trip or tour, describes,
> explains, or lectures concerning any place or point of interest in the
> District to any person.

D.C. MUN. REGS. tit. 19, § 1200.1 (2012).  The regulations then restate the statutory prohibition

on unlicensed tour guide activity in greater detail, providing:

> No person shall offer to act as a sightseeing tour guide on
> the roads, sidewalks, public spaces, or waterways of the District of
> Columbia unless the person holds a valid sightseeing tour guide
> license . . .
>
> No business or entity shall offer, for a fee, to conduct
> walking tours or tours where customers operate self-balancing
> personal transport vehicles, mopeds, or bicycles unless the
> business or entity is licensed . . .

---

[2]  A violation of the regulations promulgated under the statute, discussed infra at
3-4, carries the same penalties.  See D.C. MUN. REGS. tit. 19, ¶ 1209.2.

> No person, other than a licensed sightseeing tour company or sightseeing tour guide may use the words 'sightseeing,' 'tours,' 'guide,' or any combination of these words, to advertise the availability of sightseeing tour services.

Id. §§ 1201.1, 1201.3, 1201.5.

The regulations also set out minimum standards for qualification as a tour guide. Historically, these standards required some showing of general health, wellness, and freedom from habit-forming drugs. See Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 9. Under the revised regulations, an applicant must (1) be at least eighteen years old, D.C. MUN. REGS. tit. 19, § 1203.1(a); (2) be proficient in English, id. § 1203.1(b); (3) not have been convicted of certain specified felonies, id. § 1203.1(c); (4) make a sworn statement that all statements contained in his or her application are true and pay all required licensing fees, id. § 1203.2; and (5) pass an examination "covering the applicant's knowledge of buildings and points of historical and general interest in the District." Id. § 1203.3. The required examination, which costs two hundred dollars for first-time applicants, consists of one hundred questions compiled from various guidebooks that test general knowledge of cultural and historical points of interest in Washington. See DISTRICT OF COLUMBIA SIGHTSEEING TOUR GUIDE PROFESSIONAL LICENSING EXAMINATION STUDY REFERENCE, http://www.asisvcs.com/publications/pdf/690906.pdf (last visited Apr. 30, 2013); Pls.' MSJ Ex. A at 21:4-17.[3]

### B. Segs in the City

Plaintiffs Tonia Edwards and Bill Main own and operate "Segs in the City," a sightseeing tour company that rents Segways to customers for guided tours of Washington, D.C.

---

[3]   At least four other major cities and the National Park Service had analogous tour guide licensing regulations in place when this action began. See Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 10 n.6.

as well as Annapolis and Baltimore, Maryland.  Edwards Decl. ¶ 2; Main Decl. ¶ 2.[4]  In the

District of Columbia, Edwards and Main book up to five guided tours each day; they share the

work of training and leading groups between themselves and seasonal independent contractors.

Edwards Decl. ¶¶ 5-8.  A "Segs in the City" tour has two phases.  First, a tour leader instructs a

small group of ten or fewer people on Segway riding fundamentals and how to comply with local

traffic and safety regulations.  Id. ¶ 14.  Then, after customers master their novel transport, they

depart for one to three hours of guided sightseeing through Washington, D.C.  Id. ¶¶ 16-18.

Guides remain in constant contact with their customers during the tours, utilizing radio earpieces

distributed to members of the group to describe points of interest and answer questions.  See id.

¶ 17.  While at the preliminary injunction stage, plaintiffs said the guides only "occasionally

pointed out or described points of interest along the route," they now say the guides point out

"probably about 20 specific things . . . in the course of every tour" and are "almost always

communicating with the people on the tour."  Id. ¶ 17.

   Although plaintiffs operate in the District of Columbia, they refuse to obtain tour

guide licenses.  Edwards Decl. ¶¶ 19-20; Main Decl. ¶¶ 19-20.  They seek a declaration from this

Court that the District's tour guide licensing scheme violates the Free Speech Clause of the First

Amendment to the United States Constitution both facially and as applied to them.  Compl. at 10.

On their motion for preliminary injunction, plaintiffs argued that the District's licensing scheme

constitutes a content-based restraint on their speech to customers that fails strict scrutiny review.

See Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 12.  The Court disagreed with plaintiffs on

the proper standard of review, concluding

> that the plain reading of the municipal regulations shows that they
> are directed at plaintiffs' conduct – not their speech. . . .   The plain

---

[4]   Segways are a form of self-balancing personal transport vehicle.  Main Decl. ¶ 4.

> language of the regulations . . . makes clear that speech is not the trigger for the licensing requirement.  Rather, like the statute, the regulations are triggered by conduct: the *guiding or directing* of a sightseeing trip or tour. . . . These regulations are "unrelated to the content of expression" and have, at most, "an incidental effect on some speakers or messages but not others."

Id. at 15-16 (internal citations omitted) (emphasis in original).  The Court therefore found that the licensing scheme was a content-neutral regulation of speech subject to intermediate scrutiny under the First Amendment.  See id. at 17-20.  Determining that plaintiffs were not substantially likely to succeed under this standard, the Court denied their motion for a preliminary injunction. Id. at 19-20.  The Court now turns to the merits of this case on the parties' cross-motions for summary judgment.

## II. STANDARD OF REVIEW

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006); see Fed. R. Civ. P. 56(a), (c).  A disputed fact is "material" if it "might affect the outcome of a suit under governing law."  Holcomb v. Powell, 433 F.3d at 895.  A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb v. Powell, 433 F.3d at 895.  A court making this determination must avoid making any credibility determinations of its own and must weigh the evidence presented by each party in the light most favorable to the opposing party.  Anderson v. Liberty Lobby, 477 U.S. at 255; Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

An opposition to a motion for summary judgment must point to genuine issues of material fact supported by competent evidence beyond mere supposition. Matshushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50, 106 S. Ct. 2505; see Scott v. Harris, 550 U.S. at 380 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matshushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587 (1986)).

### III.  DISCUSSION

#### A.  Standing

In order to establish standing under Article III of the United States Constitution, a plaintiff must show, at an "irreducible constitutional minimum," that (1) he or she has suffered an injury in fact through the "invasion of a 'legally protected interest'"; (2) the injury is "fairly traceable" to the defendant's conduct; and (3) a favorable decision on the merits likely will redress the injury. Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273-74 (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61(1992)). The alleged injury must be "concrete and particularized" insofar as it cannot be imagined or based on speculative fears of future harm. Summers v. Earth Island Inst., 555 U.S. 488, 493-94 (2009); see also Enten v. Dist. of Columbia, 675 F. Supp. 2d 42, 47 (D.D.C. 2009) (injury must be "concrete and particularized and actual or imminent, not conjectural, hypothetical or speculative").

In a pre-enforcement challenge such as this one, where the plaintiffs have not yet been prosecuted for violating the regulation at issue, the concrete injury requirement may be met by showing that a plaintiff faces a "credible threat of prosecution." Holder v. Humanitarian Law

Project, 130 S. Ct. 2705, 2717 (2010) (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298

(1979)); see also Enten v. Dist. of Columbia, 675 F. Supp. at 47-48 (finding vendor had standing

to bring pre-enforcement First Amendment challenge to law requiring a license to sell buttons).

The District questions plaintiffs' standing to bring an as-applied challenge to the licensing

scheme because they have never applied for licenses nor have they been threatened with

prosecution for failing to do so.  Def.'s MSJ at 11; see also Main Decl. ¶ 11; Edwards Decl. ¶ 11.

The Court disagrees.  The fact that plaintiffs have not been prosecuted under the scheme does not

affect the substantiality of their fear of prosecution in the future.  They are not "required to await

and undergo a criminal prosecution as the sole means of seeking relief."  Holder v. Humanitarian

Law Project, 130 S. Ct. at 2717 (quoting Babbitt v. Farm Workers, 442 U.S. at 298).

Fear of sanction is evident in plaintiffs' conduct.  After the Court denied the

motion for preliminary injunction, they instructed guides in their employ to obtain licenses –

even though they themselves refuse to do so – and have even offered financial support to assist

their guides in doing so.  See Edwards Decl. ¶¶ 11-13, 20-21; Main Decl. ¶¶ 11-13, 24-25.  There

is also no question as to whether the relief requested would address plaintiffs' fear of prosecution

if they prevail.  Accordingly, the Court concludes that plaintiffs have standing to assert their

facial and as-applied challenges to the licensing scheme.

## B.  First Amendment Review

The First Amendment provides that Congress "shall make no law . . . abridging

the freedom of speech."  U.S. CONST. amend I.  Except in very limited circumstances, the First

Amendment prohibits the government from "restrict[ing] expression because of its message, its

ideas, its subject matter, or its content."  United States v. Stevens, 130 S. Ct. 1577, 1584 (2010)

(quoting Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)); see also R.A.V. v.

City of St. Paul, Minn., 505 U.S. 377, 382 (1992).  Therefore, laws regulating speech based on

its content are reviewed under a strict scrutiny standard and will be upheld "only if they promote

a 'compelling interest' and employ 'the least restrictive means to further the articulated

interest.'"  Time Warner Entm't Co., L.P. v. F.C.C., 93 F.3d 957, 966 (D.C. Cir. 1996) (quoting

Amer. Library Ass'n v. Reno, 33 F.3d 78, 84 (D.C. Cir. 1994)).

       The government has greater latitude to enact laws that only incidentally restrict

speech, and such laws are reviewed under an intermediate scrutiny test.  See United States v.

O'Brien, 391 U.S. 367, 376-77 (1968).  "[W]hen 'speech' and 'nonspeech' elements are

combined in the same course of conduct, a sufficiently important governmental interest in

regulating the nonspeech element can justify incidental limitations on First Amendment

freedoms."  Mahoney v. Doe, 642 F.3d 1112, 1118-19 (D.C. Cir. 2011) (quoting United States v.

O'Brien, 391 U.S. at 376).  Thus, Congress may pass a law or an agency may issue a regulation

regulating conduct without running afoul of the First Amendment, even if that conduct involves

expressive components – so long as the law or regulation is content-neutral, "advances important

governmental interests unrelated to the suppression of free speech, and . . . does not burden

substantially more speech than necessary to further those interests."  Time Warner Entm't Co.

L.P. v. United States, 211 F.3d 1313, 1318 (D.C. Cir. 2000) (quoting Turner Broadcasting Sys.,

Inc. v. F.C.C., 520 U.S. 180, 189 (1997)).  A government agency may, for example, prohibit

certain educational travel to Cuba to limit the flow of American currency to that country, even

though the restriction will affect the ability of professors to provide *in situ* lectures on Cuban

society and culture.  See Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury,

545 F.3d 4, 12-14 (D.C. Cir. 2008).  Similarly, Congress may enact a law prohibiting persons

from blocking access to reproductive health clinics, in order to ensure access to health services,

even though such a law will physically limit the space where abortion protestors can demonstrate and thus implicate their First Amendment right to freedom of expression.  Terry v. Reno, 101 F.3d 1412, 1420 (D.C. Cir. 1996).

### C.  Conduct vs. Speech

As noted in the Court's earlier opinion, the heart of the dispute between the parties is whether the licensing scheme directly regulates speech, or whether it targets conduct and only incidentally limits expressive activity.  See Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 15.[5]  Plaintiffs assert that not only is the act of guiding a tour itself protected expression, but that the regulations are directed at the communicative aspects of a tour guide's work – and in particular, the act of describing and explaining sites and places of interest.  The District contends that the regulations are directed at the non-expressive conduct of guiding and directing.  After considering the parties' renewed arguments and the evidentiary material submitted with their cross-motions, the Court maintains its view that the tour guide licensing scheme targets the non-expressive conduct of guiding, directing and, more broadly, escorting, a commercial sightseeing trip or tour, and only incidentally burdens speech.

Plaintiffs' assertion that the act of guiding or directing itself constitutes expressive conduct or speech is meritless.  See Pls.' MSJ at 17-19.  To constitute expressive conduct

---

[5]    The Court reserved judgment in its prior opinion as to whether this case could be resolved by analyzing the licensing scheme as a professional or occupational licensing requirement subject only to rational basis review, as the District argued.  Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 12 n.7 (citing Schware v. Board of Bar Exam'rs, 353 U.S. 232, 239 (1957) (permitting professional licensing of attorneys), and Taucher v. Born, 53 F. Supp. 2d 464, 476-78 (D.D.C. 1999) (declining to analyze registration requirements for commodity trading information publishers as a professional licensing regulation)).  The District of Columbia again raises this argument in its papers seeking summary judgment.  Def.'s MSJ at 8 n.3.  Although the Court seriously doubts that a tour guide falls within such an exception, it need not address the issue, as it concludes that the regulations survive intermediate scrutiny under the First Amendment.

protected by the First Amendment, an act must be made with an "intent to convey a particularized message," and that message must be likely to "be understood by those who viewed it." Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)). The acts of guiding and directing a tourist through a city fail this test, as such activity is not intended to communicate a "particularized message" likely to be understood  as such by those who see it. Cf. United States v. Eichman, 496 U.S. 310, 315 (1990) (recognizing flag burning as expressive conduct); Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 505-06 (1969) (wearing black armbands to protest American military actions is expressive conduct); Brown v. Louisiana, 383 U.S. 131, 141-42 (1966) (deeming sit-in to be expressive conduct). Rather, the acts of guiding and directing are intended to serve the function of moving tour participants from place to place; they are not "the expression of an idea through activity." Spence v. Washington, 418 U.S. at 411.

Plaintiffs also attempt to argue that guiding and directing constitutes speech simply because these activities involve communication. See Pls.' MSJ at 18-19. But this proposition is contrary to established First Amendment jurisprudence, as "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 62 (2006) (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949)). In sum, the "guiding" and "directing" elements of a tour guide's work fall outside the scope of the First Amendment.

Of course, the act of serving as a paid tour guide involves both nonspeech and speech elements. In addition to escorting the tour group, and guiding and directing its members, a guide typically communicates information and opinions about places of interest in Washington

D.C.[6]  The regulations at issue, however, do not *directly* regulate any form of expression, and an individual is subject to the licensing scheme only when he guides, directs, or escorts a tour for profit.  To reiterate what the Court said previously:

> [S]peech is not the trigger for the licensing requirement.  Rather, like the statute, the regulations are triggered by conduct:  the *guiding* or *directing* of a sightseeing trip or tour.  Any individual who guides or directs people around the District for profit – regardless of whether that individual, like plaintiffs, "*occasionally* point[s] out or describ[es] points of interest along the route," Edwards Decl. ¶ 17 (emphasis added) – must first acquire a license.[7]  Therefore, like the statute, these regulations require a license regardless of any message a tour guide may wish to convey.

Id. at 15 (emphasis in original).[8]

Plaintiffs argue that there have been two developments since the Court denied their motion for preliminary injunction that ought to change the Court's conclusion that the regulations target conduct rather than speech:  (1) the District's discovery responses, and (2) the

---

[6]      The regulations recognize these dual functions by requiring an individual to obtain a license only if he or she "guid[es] or direct[s]" a tour *or* "in connection with any sightseeing trip or tour," describes places of interest.  D.C. MUN. REGS. Tit. 19, § 1200.1.  Although the disjunctive "or" suggests, at first glance, that speech is directly regulated, the modifier "in connection with any sightseeing trip or tour" makes clear that the regulations apply only when an individual is engaged in the activity of escorting a tour.  The authorizing statute confirms that an individual is subject to the licensing requirement only if he or she engages in the conduct of "guid[ing] or escort[ing]" a paid tour.  D.C. CODE § 47-2836(a).

[7]      Plaintiffs now have abandoned the "occasionally" characterization from their earlier declarations.  See supra at 5.

[8]      In its prior opinion, the Court reviewed the licensing scheme as a content-neutral prior restraint on speech in order to afford the greatest possible weight to plaintiffs' claims that the licensing scheme regulates speech.  See Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 17-18.  Because plaintiffs have not produced any additional evidence to show how their speech triggers the licensing scheme, the Court now finds that any effect on plaintiffs' expression is incidental to the conduct of providing guided tours.

Supreme Court's decision in <u>Sorrell v. IMS Health, Inc.</u>, 131 S. Ct. 2653 (2011). The Court will discuss each in turn.

Plaintiffs first ask the Court to reconsider its decision in light of additional evidence offered in the form of testimony by a representative of the District of Columbia at her deposition.  <u>See</u> Pls.' MSJ at 24-27.  The relevant testimony is as follows:

> Q.	Why is a license only required of a driver if he conveys sightseeing information?
>
> A.	Because he is providing information and one could go back and ask a question and he could therefore answer.
>
> Q.	Okay, . . . so the licensing requirement is triggered by someone being able to answer questions –
>
> A.	. . . You're correct.
>
> Q.	– on particular topics.
>
> A.	You're correct.
>
> *   *   *
>
> A.	You're correct, answering questions, pointing out sights, things of that nature.

McNamara Decl., Ex. B at 22:7-17, 24:10-11 (deposition testimony of Adrienne W. Wilson). This testimony provides no basis for the Court to reconsider its conclusion that the licensing scheme is aimed at conduct and does not unconstitutionally burden speech.

The statute, which never references speech, provides that "[n]o person shall, for hire, guide or escort any person through or about the District of Columbia, or any part thereof, unless he shall have first secured a license so to do."  D.C. CODE § 47-2836(a).  The implementing regulations clarify what it means to "guide or escort any person through or about the District of Columbia" for hire.  Under the regulations, an individual is covered by the statute

if he or she either "engages in the business of guiding or directing people to any place or point of interest in the District" or "in connection with any sightseeing trip or tour, describes, explains, or lectures concerning any place or point of interest in the District to any person."  D.C. MUN. REGS. tit. 19, § 1200.1.[9]  Similarly, under the regulations, a bus driver of a sightseeing tour bus who, in addition to driving, also "talks, lectures, or otherwise provides sightseeing information to passengers while the vehicle is in motion," D.C. MUN. REGS. tit. 19, § 1204.3 – just like any other person who, in connection with a sightseeing trip or tour, "describes, explains, or lectures concerning any place or point of interest," id. § 1200.1 – must be licensed as a tour guide.

The plain language of the regulations thus makes clear that speech is not the impetus for the licensing requirement.  Rather, the tour guide licensing regulations are triggered by conduct: the guiding, directing, or escorting of a sightseeing trip or tour.  Furthermore, the regulations are "unrelated to the content of expression" or the message conveyed; they do not directly regulate speech.  Mahoney v. Dist. of Columbia, 662 F. Supp. 2d 74, 87 (D.D.C. 2009), aff'd, 642 F.3d 1112 (D.C. Cir. 2011).  At most, they have an incidental effect on one category of speakers – tour guides – but not on others.  See id. ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers . . . but not others.") (emphasis added).  Therefore, although the regulations explicitly mention certain types of speech – "describes, explains, or lectures" – they are not directed towards regulating speech or its content.  See Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d at 12 (upholding licensing requirement for educational travel as content-neutral regulation directed at conduct, noting that right of free speech "can be invoked

---

[9]     The regulations do not expressly define the term "sightseeing trip or tour."  In light of the statutory phrase "for hire", and the regulations taken as a whole, the Court construes the term as signifying only tours for which customers are charged a fee.

only to prevent a governmental effort to regulate the *content* of a professor's academic speech"). The deposition testimony of Ms. Wilson changes nothing.

Turning to the second recent development on which plaintiffs rely, the Supreme Court's decision in Sorrell v. IMS Health Inc., 131 S. Ct. at 2664-65, plaintiffs argue that the tour guide licensing scheme at issue here must be content-based because it discriminates against a certain class of speakers – individuals wishing to act as tour guides. See Pls.' MSJ at 20-21.  In Sorrell, the Supreme Court found unconstitutional a Vermont law that strictly limited the sale by pharmacies of records showing local doctors' prescribing habits and banned outright the publication of such records by pharmaceutical marketing companies, while permitting distribution of the same information by others.  See id. at 2663; 2671-72.  The Court found that Vermont's law could not survive a First Amendment challenge because it was both "content-based" and discriminatory on the basis of viewpoint; it disfavored speech "with a particular content," as well as "specific speakers."  Id. at 2663.  Applying the established principle that government cannot regulate speech "because of disagreement with the message it conveys," id. at 2664 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)), the Court applied strict scrutiny analysis.

Sorrell is distinguishable from the present case because the tour guide regulations are neither content-based nor speaker-based; rather, *all* persons who act as paid tour guides are subject to identical regulations.  While the District's tour guide licensing scheme will fall disproportionately on individuals wishing to act as tour guides for hire, it is not because of the content of what they say, but because of what they do.  And as the Supreme Court has recognized, where a law prohibits certain conduct, the incidental burdens on speech will *always* fall disproportionately on those individuals who wish to engage in the restricted conduct.  See

Christian Legal Soc. Chapter v. Martinez, 130 S. Ct. 2971, 2994 (2010) ("[A] regulation that

serves purposes unrelated to the content of expression is deemed neutral, even if it has an

incidental effect on some speakers or messages but not others.") (quoting Ward v. Rock Against

Racism, 491 U.S. at 791).  This obvious conclusion does not render the licensing scheme

constitutionally suspect, and Sorrell does not support plaintiffs' argument that it does.

### D. Intermediate Scrutiny

Because the Court has found that the tour guide licensing regulations govern

conduct and only incidentally burden speech, they are subject to intermediate scrutiny under the

test laid out in United States v. O'Brien, 391 U.S. at 377.  Under this standard, a law is valid

> . . . [i] if it furthers an important or substantial governmental
> interest; [ii] if the governmental interest is unrelated to the
> suppression of free expression; and [iii] if the incidental restriction
> on alleged First Amendment freedoms is no greater than is
> essential to the furtherance of that interest.

Id.; see also Terry v. Reno, 101 F.3d at 1419.  This inquiry looks to the substance of the

government's interest in regulating the conduct at issue and whether the means chosen to serve

that interest unnecessarily burden expression.  See Palestine Info. Office v. Shultz, 853 F.2d 932,

939-40 (D.C. Cir. 1988) (upholding government order that revoked organization's "foreign

mission" status due to foreign policy concerns, where order did not disable organization from

independent advocacy on behalf of Palestine); Emergency Coal. to Defend Educ. Travel v. U.S.

Dep't of the Treasury, 545 F.3d at 12 ("[C]ontent-neutral regulations that have an incidental

effect on First Amendment rights will be upheld if they further 'an important or substantial

governmental interest.'") (quoting Walsh v. Brady, 927 F.2d 1229, 1235 (D.C. Cir. 1991)).

Under the intermediate scrutiny standard, it is not fatal to a law that most people

engaging in the regulated conduct also tend to be speaking about a particular subject – so long as

the government's regulatory interest is unrelated to the content of that expression or the message conveyed.  See Christian Legal Soc. Chapter v. Martinez, 130 S. Ct. at 2994; Terry v. Reno, 101 F.3d at 1420 (upholding restrictions preventing demonstrators from obstructing access to reproductive health clinics).  "Content-neutral regulations do not pose the same 'inherent dangers to free expression' that content-based regulations do, and thus are 'subject to a less rigorous analysis.'"  Turner Broadcasting Sys., Inc. v. F.C.C., 520 U.S. at 213 (internal citations omitted).  Accordingly, in promoting the tourism industry, for example, the District "may employ the means of its choosing 'so long as the . . . regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation,' and does not 'burden substantially more speech than is necessary to further' that interest."  Id. at 213-14 (internal quotation omitted).

Again, to satisfy the intermediate scrutiny test under O'Brien, a statute or regulation that incidentally burdens speech must further a substantial governmental interest, that interest must be unrelated to the suppression of free expression, and the restriction on expression must be no greater than necessary.  The licensing scheme here meets that three-part test.

1.  The District of Columbia Has a Substantial Regulatory Interest

Intermediate scrutiny review does not require a court to question a legislative or regulatory judgment so long as the government presents evidence that a challenged law addresses a perceived harm that is "real, not merely conjectural."  See Time Warner Entm't Co., L.P. v. United States, 211 F.3d at 1318-19.  To make its case, the government is permitted to draw support from historical, anecdotal, and empirical sources, as well as "simple common sense."  Florida Bar v. Went For It, Inc., 515 U.S. 618, 628-29 (1995) (collecting cases).  A challenger cannot overcome the government's showing of a substantial regulatory interest with

bare assertions of an unarticulated legislative hostility to incidentally burdened speech.  See

United States v. O'Brien, 391 U.S. at 383 ("It is a familiar principle of constitutional

adjudication that [the Supreme] Court will not strike down an otherwise constitutional statute on

the basis of an alleged illicit legislative motive.").

      The Court disagrees with plaintiffs' contention that the District's regulatory

interest is presumed "illegitimate" until it presents substantial evidence showing that its licensing

regulations address a real threat to public welfare.  See Pls.' Reply at 17-18.  This overstates the

District's burden under intermediate scrutiny to demonstrate that an unregulated tourism industry

would pose some social harm or that the regulations serve a useful purpose.  See Florida Bar v.

Went For It, Inc., 515 U.S. at 628.  The Court finds that the District has provided credible

evidence in support of its regulatory interests, including legislative and anecdotal records

detailing how its licensing scheme emerged in response to public pressure in Washington to

"regulate unscrupulous businesses" with licensure, see Def.'s MTD at 5-9; Def.'s Opp. at 9, and,

more recently, how it provides for the general welfare of tourists and visitors, promotes the

tourism industry, and ensures that tour guides have a minimal level of competence and

knowledge.  Def.'s MSJ at 10.

      While a law's longstanding maintenance on the books is not by itself proof of its

constitutionality, there is evidence here that the public harms and public interests addressed by

the licensing scheme are more than speculative.  As the Court recognized at the preliminary

injunction stage, at least two substantial regulatory interests supporting the District's tour guide

licensing scheme:

> (1) the purpose of providing for the general welfare of society by
> attempting to ensure that those with serious felonies on their
> records are not guiding or directing tourists and residents around
> the District, and (2) the purpose of promoting the tourism industry

> by attempting to ensure that those who guide or direct people
> around the District have, at least, some minimal knowledge about
> what and where they are guiding or directing people to.

Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 19.  The regulations further substantial and

legitimate regulatory interests.

    2.  The Government's Interests are Unrelated to the Suppression of Free Expression

      Plaintiffs next attack the District's regulatory interest by claiming that, even if the

licensing laws and regulations serve the public interest, that interest necessarily relates to the

suppression of or interference with speech.  See Pls.' Reply at 9.  Plaintiffs argue that the

District's stated interest in protecting tourists from uninformed guides for the sake of the tourism

industry is only jeopardized if a guide leads his or her customers astray with speech – an interest,

they say, that is "related to expression" and thus "a restriction on speech."  Pls.' Reply at 12.  For

support, plaintiffs reference the historical subject matter a prospective guide must learn in order

to pass the licensing examination, and conclude:  "These requirements can only be understood as

an attempt to ensure that a guide is . . . able to communicate properly when they talk about the

District. . . .  Simply put, there is no way to read the regulations as restricting anything but

communication."  Pls.' MSJ at 19.

      The Court agrees that the requirement that an applicant have basic knowledge "of

buildings and points of historical and general interest in the District," D.C. MUN. REGS. tit. 19,

§ 1203.3, unlike the other licensing requirements, relates in part to the expressive element of a

tour guide's work.  The testing requirement ensures that individuals who are paid to lead tourists

to different places of interest in the District have some basic knowledge about those sites.[10]  But

---

[10]    The testing requirement also helps to ensure that tour guides have a basic
familiarity with Washington, D.C., and the addresses and locations of its major sites, which

it goes too far to say that the government's interest in promoting tourism through a minimum competency examination therefore relates to the *suppression* of speech, or even that the speech element is being directly regulated.  Rather, the examination requirement serves a basic consumer protection function by ensuring that persons selling their services – those of a knowledgeable and trustworthy guide – are at least minimally qualified to do so.

The testing requirement in Section 1203.3 of the municipal regulations, along with the other minimum requirements for licensure, protect more than a narrow interest in safeguarding tourists from false speech.  They ensure that prospective guides are who they say they are: persons with at least a minimal grasp of the history and geography of Washington, D.C. See Edwards v. Dist. of Columbia, 765 F. Supp. 2d at 17 ("the purpose of this examination is to ensure some minimal competence and knowledge for those who 'guid[e] or direct[] people' around the District of Columbia").  Nothing about the District's interest in keeping visitors from dangerous, unethical, or uninformed guides "is remotely related to the suppression of free expression," Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury, 545 F.3d at 13, or intended to control the content of what a tour guide may say during tours.  See Terry v. Reno, 101 F.3d at 1419.  Because plaintiffs can show neither that the licensing requirements themselves unfairly disqualify applicants based on speech or its content nor that the District does anything to monitor the guides' command of history beyond an initial examination, the Court concludes that the District's interest is unrelated to the suppression of free expression.

3.  The Regulations' Burdens on Speech are Incidental and No Greater than Necessary

Plaintiffs argue that the examination and fee requirements are financially burdensome and force them to waste time studying irrelevant material.  See Edwards Decl. ¶ 20;

---

promotes the government's interest in ensuring that a guide may direct tourists safely throughout the District.

Main Decl. ¶ 22.  They also express concern that their business model will suffer if the District requires seasonal guides on their staff to obtain licenses because the cost could outweigh the benefit of short-term employment.  See Edwards Decl. ¶¶ 11-13; Main Decl. ¶¶ 12-13, 24.  The Court has reviewed a copy of the required examination, filed under seal.  Although it agrees with plaintiffs that certain questions on the exam are odd, obscure or "picayune," Pls.' MSJ at 9, the Court finds that the vast majority of questions are generally consistent with the District's stated interest in ensuring basic competence of those conducting tours for pay.  Plaintiffs' claim that they would have to spend "hours" studying for the licensing exam, see Edwards Decl. ¶ 20; Main Decl. ¶ 22, accepted as true for the purposes of the District's summary judgment motion, does not constitute an impermissible burden on speech.  Plaintiffs have provided no evidence that any of their employees have had difficulty obtaining a license when they have attempted to do so.  See Main Decl. ¶¶ 12-13 (stating that "at least three of [their] guides have completed the tour-guide licensing process"); cf. id. at ¶¶ 22, 25 (stating that Main's most important reason for not obtaining a license himself "is one of principle"); see also Edwards Decl. ¶ 21.[11]  And plaintiffs have not identified any restriction on their speech under the scheme that is any more than the incidental byproduct of the regulation of their conduct as tour guides.  Without more, none of plaintiffs' objections to the requirement of licensure are of constitutional magnitude or reflect the type of burden that offends the First Amendment.

---

[11]     Plaintiffs have offered evidence that at least one individual was dissuaded from giving commercial tours because the licensing requirements "seemed like a real burden," in that she would have to "study for a test that, from what [she] heard, required a lot of unnecessarily specific information like the particular street address of individual monuments," and "fill[] out paperwork."  Declaration of Megan Buskey, Pls.' Opp. Ex. 2 ¶¶ 6-7.  Such evidence is insufficient to create an inference that the burdens imposed by the licensing scheme are unreasonable.

Plaintiffs suggest less intrusive regulatory alternatives that the District of Columbia might have considered instead of the current licensing regime:  hiring its own fleet of official tour guides and thereby imposing no burdensome restrictions on private actors, see Pls.' MSJ at 32, or making its licensing laws voluntary.  Id. at 32-33.  Neither would serve the legitimate purposes now served by the licensing scheme.  More importantly, the District cannot be required to adopt an alternative that embodies plaintiffs' "[dis]agreement with [the District] concerning . . . the degree to which [its] interests should be promoted," Turner Broadcasting Sys., Inc. v. F.C.C., 520 U.S. at 193 (first alteration in original) (citing Ward v. Rock Against Racism, 491 U.S. at 800), or that requires it to incur the substantial costs involved when the service can be provided without government expense through minimally regulated private providers.  The tour guide licensing provisions do not burden substantially more expression than is necessary to meet the District's regulatory goals of protecting tourists and ensuring tour guide competence.  The Court therefore concludes that the regulations withstand intermediate scrutiny under the First Amendment.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the District of Columbia is entitled to judgment as a matter of law.  Accordingly, the Court has denied plaintiffs' motion for summary judgment and granted defendant's motion for summary judgment.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  May 7, 2013